UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Deana Brown**

     v.                             Case No. 18-cv-54-PB
                                       Opinion No. 2021 DNH 109
**Denis McDonough, Secretary,**
**U.S. Department of Veterans Affairs**


## MEMORANDUM AND ORDER


Pro se plaintiff Deana Brown has sued her former employer, the Secretary of the United States Department of Veterans Affairs (the "VA"), for wrongful termination under Title VII of the Civil Rights Act of 1964. Brown claims that she was discharged from her position as a registered nurse and not hired for three other positions within the VA on account of her race and in retaliation for her complaints about harassment. The defendant has filed a motion for summary judgment, to which Brown has objected. The defendant's principal argument is that Brown has failed to produce evidence from which a factfinder could conclude that the stated reason for her termination – a peer review board's finding that Brown had repeatedly engaged in improper conduct – was a pretext for either discrimination or retaliation. For the following reasons, I grant the defendant's motion for summary judgment on all claims.

# I.    BACKGROUND[1]

Brown, an African American woman, was hired in May 2014 to fill a permanent position as a registered nurse at the VA Medical Center in Manchester, New Hampshire ("Manchester VA"). Her appointment was subject to a two-year probationary period. She was terminated in November 2014, less than seven months into her employment, based on a peer review board's finding that she had engaged in a series of violations of workplace rules and policies.

## A.    Probationary Period Review Process

Permanent appointments of registered nurses in the VA system are made under 38 U.S.C. § 7401(1).  The appointments are subject to a two-year probationary period set forth in 38 U.S.C. § 7403(b)(1).  During that two-year period, a Nurse Professional Standards Board ("NPSB" or "Board"), which consists of three or five voting members who are registered nurses, periodically reviews a probationary nurse's work records.  If the Board determines that a probationary nurse is not "fully qualified and satisfactory," the nurse is terminated.  38 U.S.C. § 7403(b)(4); see Doc. No. 110-2.

---

[1] I summarize only those facts that are relevant to my resolution of the defendant's motion.  Consistent with the summary judgment standard, the facts are presented in the light most favorable to Brown as the non-moving party.  See Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

In addition to periodic reviews, a nurse on probationary status may be subject to "a summary review" by the Board in situations where swift separation from service may be justified. A supervisor may initiate a request for summary review at any time during the probationary period. The Board's purpose in conducting a summary review is to obtain the facts and determine whether the probationary employee should be retained or separated. In addition to reviewing records submitted by the supervisor and any countervailing evidence submitted by the employee, the Board may call persons to answer questions that may assist its fact-finding. Upon completion of its summary review, the Board issues findings and recommends the employee's retention or separation. The Board's findings and recommendation are forwarded to the director of the employing facility, who may approve, disapprove, or modify the Board's recommendation. See Doc. No. 110-2.

In October 2014, approximately six months into Brown's employment at the Manchester VA, Brown's direct supervisor, Donna Primera, requested that a summary review Board be convened to determine whether Brown should be terminated. Primera's request listed multiple instances of improper conduct that had caused her to lose confidence in Brown as an employee. The events that led to this summary review, detailed below, started shortly after Brown's employment began.

**B.    The June Incident**

On June 25, 2014, Brown and Lee Bowley, a health technician
at the Manchester VA, had a verbal altercation within earshot of
other staff and patients.  It began after a supervisor who could
not locate Brown asked Bowley to find her so that Brown could
assist with a task.  Another colleague told Bowley that earlier
that day Brown had "announced . . . that she is not to be
notified about patients . . . [and] that she is in training and
does not 'work' [in that particular department] so there is no
reason for anyone to try and contact her."  Doc. No. 83-8 at 1.
When Bowley found Brown a short time later, a heated exchange
ensued.  According to Brown, Bowley ordered her to give an
injection to a patient in an inappropriate setting.  When Brown
refused, Bowley began yelling and demanding that Brown follow
her instruction.  Brown responded by walking out of the office
where the two of them were standing and into a hallway where
they could be overheard by patients and other staff.  Bowley
then escalated the situation, pointing her finger at Brown and
demanding that Brown return to the office so that they could
have a "[p]ow wow" and "duke it out" behind closed doors.  Doc.
No. 83-11 at 3.  Brown perceived those comments as a threat of
physical assault.  Brown admits that her own voice became
"elevated" at some point.  Doc. No. 66-14 at 57.  The exchange
ended when a physician, who described Brown and Bowley as

"screaming at each other" and using "angry voices," told them to take their argument elsewhere.  Doc. No. 83-7; Doc. No. 110-4 at 8.

Brown immediately reported the incident to her supervisors, complaining that Bowley had verbally and physically threatened her.  Brown also filed a report with the Manchester VA police, reporting Bowley for threatening and harassing her.  After the police investigated the matter, Brown was advised that the matter was not criminal and that she should contact the Equal Employment Opportunity ("EEO") office.  Brown promptly contacted the EEO manager at the Manchester VA in early July, who directed her to the facility's Threat Committee.

With the assistance of a union representative, Brown subsequently filed multiple grievances between July and September, both with Primera and Tammy Krueger, the Manchester VA's Director.  Brown complained about a hostile work environment stemming from the June incident and a subsequent run-in when Bowley had briefly entered an office where Brown was training.  Brown also complained to Director Krueger in September about the management's inaction in responding to her grievances, accusing Primera of failing to provide her with safe working conditions.  Brown's principal demand was that Bowley not be allowed within 100 feet of her, which Director Krueger declined to accommodate.  Instead, Brown was told that she would

not be assigned to work with Bowley, but that patient care issues may require them to interact at times.

In response to Brown's grievances, Director Krueger asked Primera to conduct an inquiry into the June incident. Primera presented her fact-findings in September, concluding that both Bowley and Brown should face disciplinary action for unprofessional conduct during that episode. According to Primera, Brown and Bowley had given conflicting versions of the encounter, with each accusing the other of inappropriate behavior and describing her own behavior as professional. Primera placed most weight on the witnessing physician's statement that both women spoke in "angry voices in an inappropriate setting." Doc. No. 110-4 at 8. A letter of reprimand was placed in each woman's personnel file, and Primera decided to give both of them training materials on workplace civility.

As Primera tried to give the materials to Brown on October 8, Brown asked to record the meeting with her cell phone camera. When Primera refused, Brown declined to accept the materials. Two days later, Primera tried to meet with Brown to give her an interim proficiency report, but Brown refused to meet.

## C.   July Travel Issues

Meanwhile, Primera arranged for Brown to attend training in Coatesville, Pennsylvania from July 7 until July 11, 2014.

Brown's round-trip flight and ground transportation were pre-arranged, and she was given a government credit card to use for travel expenses. Prior to the trip, Brown completed training involving use of a government credit card and signed a statement certifying that she would use the card "only for those necessary and reasonable expenses incurred . . . for official travel," and that cash withdrawals would "not exceed the allowable per diem amounts." Doc. No. 83-23. At that time, the per diem amount for meals and incidentals in the Coatesville area was $51.[2] The statement Brown signed warned her that "failure . . . to abide by these rules or other misuse of the [government card] may result in disciplinary and/or administrative action." Doc. No. 83-23. Brown also received the VA Travelers' Information instructions, which specified that travelers "must call the Manchester Travel staff for approval" before altering travel plans and included a phone number to call in case of a flight change or problems with travel. See Doc. No. 83-24.

On July 10, the day before Brown was scheduled to return home, there was a storm in the Coatesville area that led to a 24-hour power outage at Brown's hotel and the cancellation of a

_____

[2] U.S. General Service Administration, "FY 2014 Per Diem for Pennsylvania," https://www.gsa.gov/travel/plan-book/per-diem-rates/per-diem-rates-lookup/?action=perdiems_report&state=PA&fiscal_year=2014&zip=&city= (last visited July 12, 2021).

shuttle that was scheduled to take Brown to the airport. As a result, Brown missed her flight. Instead of contacting the VA travel number for assistance, Brown called her childcare provider in Augusta, Maine and arranged for him to drive to Pennsylvania with her two children to pick her up. Brown withdrew $200 in cash from her government credit card at an ATM machine, after two attempts for larger amounts were declined. She did not seek prior authorization for that withdrawal, as required by the VA's policies. She used the cash to pay for gas and other travel expenses.

When she returned to the Manchester VA the following Monday, Brown emailed her hotel receipt to a travel clerk and mentioned in that email that she had "found [her] own transportation back" due to a storm. Doc. No. 66-22. She did not explain that she had missed her flight and had arranged for someone to drive her home. A few days later, Brown submitted a request for four hours of compensatory time credit due to her travel, again without disclosing the circumstances of her return trip. The same travel clerk filled out the request form on Brown's behalf, and Brown signed it before submission.

Several weeks after Brown's trip, fiscal staff brought to Brown's and Primera's attention three issues with respect to charges on Brown's government credit card: (1) the $200 cash withdrawal; (2) a $25 charge for gas purchased on July 14 (three

days after Brown's travel ended); and (3) a meal charge on July
12 (one day after her travel ended).  In response, Brown
explained to Primera the situation with the storm that led to
the cash withdrawal, informing Primera for the first time that
she had missed her flight and traveled home by car.  When
Primera asked why Brown did not call anyone at the Manchester VA
or the VA travel number when she missed her flight, Brown said
that she did not have access to a phone.  Brown acknowledged,
however, that she had managed to call her childcare worker to
pick her up.  With respect to the meal charge, Brown stated that
it was made on July 11, during her drive home, and that the
reported transaction date must have been wrong.  As for the gas
charge, Brown chalked it up to a mistake.  She did not know
exactly what had happened, but she believed that either she or
her childcare worker accidentally used the wrong card after her
trip because all her cards looked alike.  Brown took the
responsibility for that mistake and paid the gas charge herself.

        As part of her inquiry into Brown's credit card usage,
Primera called the hotel where Brown had lodged while in
Pennsylvania.  A manager verified that a storm had caused a
power loss during Brown's stay but explained that the hotel had
an emergency generator and that the guest phones and internet
had worked.  He also noted that the guests were given the option
to go to other hotels that had power.

Primera ultimately concluded that Brown had misused her government credit card by withdrawing the cash without prior approval and failing to prevent the gas purchase.  She gave Brown the benefit of the doubt on the meal purchase.  Primera also concluded that Brown had violated the VA's policies when she submitted her request for compensatory travel time without informing fiscal staff or Primera that she had traveled home by car instead of flying.  These findings, together with the issues arising from the June incident, formed the core of Primera's request for summary review of Brown's employment.

**D.    Summary Board Review and Termination**

On October 21, 2014, the NPSB informed Brown that it was conducting a summary review of her probationary employment in order to make a recommendation concerning her retention or separation from service, and that a hearing would be held on November 4 and 6.  The notice listed nine alleged deficiencies in Brown's conduct or performance that the Board would review: (1) inappropriate conduct during the June incident with Bowley; (2) inappropriate ATM cash withdrawal from her government credit card; (3) failure to prevent misuse of her government credit card in connection with the gas purchase; (4) failure to provide information about her changed travel plans with the submission of her request for compensatory travel time; (5) failure to follow the chain of command when calling out or requesting

assistance; (6) difficulty in interpersonal relationships at work; (7) failure to complete orientation within three months of hire; (8) refusal to accept training materials on workplace civility from her supervisor; and (9) refusal to meet with her supervisor to receive her interim proficiency report.

Prior to the summary review hearing, Brown submitted written responses and countervailing evidence to the Board, including fourteen letters from colleagues attesting to her satisfactory job performance and interpersonal skills. Brown also testified before the Board, accompanied by a union representative.

At the conclusion of the hearing, the Board, which consisted of five registered nurses, unanimously recommended Brown's termination. The Board sustained all charges except for the alleged failures to follow the chain of command and to complete orientation. The Board noted that the evidence and testimony "included factual discrepancies and raised concerns regarding Ms. Brown's judgment and interpersonal effectiveness." Doc. No. 83-49 at 2. The Board added that Brown "did not accept responsibility for many of her actions and that she lacked insight into the impact of her behavior." Doc. No. 83-49 at 2.

Director Krueger approved the Board's recommendation that Brown be separated from service during her probationary period. Brown's last day of employment was November 28, 2014.

### E.    Failure to Hire for Other Positions

Shortly before the Board's summary review hearing, Brown applied for two positions within the Manchester VA.  In October 2014, she was offered the position of a Caregiver Support Nurse. The offer was made contingent upon the results of the Board's summary review and the approval of Director Krueger.  That offer was rescinded after the Board recommended Brown's termination. Brown also had an interview scheduled in mid-November for a Business Service Line Nurse Manager position.  Once Brown shared the results of the Board's summary review with the hiring official, she was told that she would not be a good candidate for the position and the interview was cancelled.

After her termination from the Manchester VA, Brown applied for a registered nurse position at the VA Central Massachusetts Healthcare System ("Massachusetts VA") in February 2015.  She was interviewed by telephone and received the lowest score of the six candidates who were interviewed.  The interviewing committee included Dr. Jeffrey McCarthy, the program manager at the Massachusetts VA, who had recently issued a fact-finding report to the Manchester VA following an investigation into allegations of bullying and abusive behavior made against Primera.  Brown was not interviewed as part of Dr. McCarthy's investigation, and nothing in his report suggests that he was aware of her complaints against the Manchester VA.

**F.    Procedural History**

On November 20, 2014, approximately a week before her effective date of termination, Brown filed a formal complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that she was subjected to a hostile work environment and discrimination based on her race during her employment at the Manchester VA.  An EEOC administrative law judge dismissed her claims at summary judgment, concluding that the record contained no evidence that could lead to a reasonable inference that the allegedly harassing conduct was based on Brown's race or that her termination was motivated by discriminatory animus.  Brown then filed the instant complaint in this court.

Brown filed a separate complaint with the EEOC concerning her non-selection for the position at the Massachusetts VA. That complaint was also dismissed on summary judgment due to a lack of evidence that she was denied the position based on her race.  After the EEOC upheld the dismissal on appeal, Brown amended her complaint in this action to include a claim concerning that position.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if a factfinder could resolve the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). Once the movant has properly presented such evidence, the burden shifts to the nonmovant to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in [her] favor." Irobe, 890 F.3d at 377 (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). If the nonmovant fails to adduce such evidence on which a reasonable factfinder could base a favorable verdict, the motion must be granted. Celotex, 477 U.S. at 324. In considering the evidence, the court must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC,

890 F.3d 342, 348 (1st Cir. 2018). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, this standard compels summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Brandt v. Fitzpatrick, 957 F.3d 67, 75 (1st Cir. 2020) (quoting Ray v. Ropes & Gray LLP, 799 F.3d 99, 116–17 (1st Cir. 2015)).

### III. ANALYSIS

Brown claims that she was terminated from her probationary employment at the Manchester VA because of her race and in retaliation for her complaints of harassment. She also alleges that she was not hired for three other positions within the VA for the same impermissible reasons. I address the claims in turn and conclude that the defendant is entitled to summary judgment on all claims.

### A. Discriminatory Termination Claim

Title VII prohibits discharging an individual "because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Where, as here, there is no direct evidence of discrimination, courts utilize the indirect, burden-shifting method of proof set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that framework, a plaintiff must initially establish a prima facie case of discrimination by showing that (1) she was a member of a protected class, (2) she was qualified for and doing

the job well enough to meet her employer's legitimate expectation, (3) she was discharged, and (4) her position was subsequently filled by someone with similar qualifications. Bonilla-Ramirez v. MVM, Inc., 904 F.3d 88, 94 (1st Cir. 2018). If the plaintiff succeeds in establishing a prima facie case, a rebuttable presumption of discrimination is created, and the burden of production shifts to the employer to articulate a legitimate reason for the termination. Id.; see McDonnell Douglas, 411 U.S. at 802-03. If the employer is successful, the presumption of discrimination dissipates, and the burden shifts back to the plaintiff to show that the employer's proffered reason was a pretext for discrimination. Bonilla-Ramirez, 904 F.3d at 94; see McDonnell Douglas, 411 U.S. at 804-05.

To satisfy this burden, the plaintiff "must elucidate specific facts which would enable [a trier of fact] to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." Theidon v. Harvard Univ., 948 F.3d 477, 497 (1st Cir. 2020) (quoting Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 452 (1st Cir. 2009)). There is no "mechanical formula" for establishing pretext, which is heavily fact specific. Alston v. Town of Brookline, 997 F.3d 23, 45 (1st Cir. 2021). One way the plaintiff may show pretext is by exposing "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Billings v. Town of Grafton, 515 F.3d 39, 55–56 (1st Cir. 2008) (quoting Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)); see Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000). Another way to establish pretext is to produce evidence that the plaintiff was treated differently than other similarly situated employees. Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003).

The defendant does not dispute that Brown has satisfied the prima facie burden, and Brown does not dispute that the VA has articulated a legitimate reason for firing her. The parties' primary focus is on whether the VA's grounds for terminating Brown – the Board's findings of misconduct – were pretextual. Under these circumstances, it is appropriate to "dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a [triable] question as to pretext and discriminatory animus." Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 662 (1st Cir. 2010) (quoting Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996)). Accordingly, I turn to Brown's evidence that the VA's reasons for terminating her probationary employment were a mere pretext for discrimination.

Brown does not contest that she engaged in conduct that gave rise to most of the violations that the Board sustained. Instead, her principal argument is that there were mitigating circumstances that she presented to Primera and the Board and that their failure to accept her explanations is sufficient to establish pretext. I examine each violation that the Board sustained in turn and conclude that Brown's evidence does not give rise to a triable claim that her termination was pretextual.

### 1. Inappropriate conduct during the June incident

The Board found that Brown had engaged in inappropriate conduct during the verbal altercation she had with Bowley in June. Brown argues that the Board should have accepted her account that Bowley was the only one responsible for the heated exchange. Brown, however, has conceded that her own voice was "elevated" during the exchange, which occurred within earshot of patients and other staff. In addition, she has not disputed the evidence that a physician witnessing the encounter perceived both women as "screaming at each other" and using "angry voices in an inappropriate setting." Accordingly, Brown has not established that the Board's finding that she had acted inappropriately during that incident was mistaken, let alone that it was a pretext for discrimination.

Brown next contends that she was treated less favorably than Bowley, who is white and was likewise found by Primera to have acted inappropriately. Bowley, like Brown, had a reprimand letter placed in her file and was asked to review training materials on workplace civility, but she was not fired. Brown is correct that differential treatment based on a violation of the same work rule can show pretext when an employee outside the protected class is not similarly treated. See, e.g., Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 222 (1st Cir. 2007); Kosereis, 331 F.3d at 214. But in order to show pretext in this manner, Brown must demonstrate that Bowley was "similarly situated to [her] in all relevant respects." Kosereis, 331 F.3d at 214 (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999)). She has failed to make that showing. First, there is no evidence that Bowley was a probationary employee against whom summary review proceedings could even be initiated. A VA employee who has successfully completed the probationary period has substantially more job protection than one who is still on probation. Cf. Durr v. Shinseki, 638 F.3d 1342, 1344-45 (11th Cir. 2011). Second, Brown has not shown that Bowley had engaged in a pattern of conduct similar to her own, which included multiple violations over a short period. Because Brown has not presented a suitable

comparator, I cannot infer that the Board's finding was a
pretext for discrimination.

### 2.   Cash withdrawal from government credit card

The Board found next that Brown had inappropriately
withdrawn $200 in cash from her government credit card, after
two attempts for larger amounts failed, in violation of the VA's
policies requiring prior approval for such withdrawals.  Brown
admits that she made the unauthorized cash withdrawal.  Further,
she does not dispute that, prior to her trip, she signed a
statement acknowledging that cash withdrawals must be limited to
the per diem amount, which was significantly lower than the
amount she withdrew.  Therefore, the factual underpinnings of
the Board's finding that Brown acted inappropriately in this
instance are uncontested.

In her attempt to impugn the Board's conclusion, Brown
argues that the Board should have considered the exigent
circumstances that led to the cash withdrawal, namely that she
had missed her flight due to a storm, had no way of contacting
the VA travel staff for prior approval, and needed the money to
arrange her transportation home.  That the Board found Brown in
violation of the VA's policies despite those mitigating
circumstances is not indicative of a discriminatory motive.  As
the Board noted, there were factual discrepancies in Brown's
testimony.  Although the Board did not elaborate, it is apparent

from the record that one such discrepancy stems from Brown's admission that she managed to call her childcare provider at the same time she claimed she had no access to a phone to contact the VA, as well as the hotel manager's statement that guest phones were working despite the power outage.  Therefore, Brown has not presented evidence that could lead a reasonable factfinder to conclude that this proffered reason for her firing is "unworthy of credence."  See Reeves, 530 U.S. at 143; Billings, 515 F.3d at 55-56.

### 3.  Personal gas purchase on government card

The Board also found that Brown had failed to prevent the misuse of her government credit card when a $25 gas purchase was charged to the card three days after Brown's official trip had ended.  Brown admitted to the Board that either she or her childcare provider made this purchase, but she maintained that it was a mistake owing to the similarity of her credit cards and that she had promptly paid the charge after fiscal staff notified her of the issue.

Brown first argues that, because she remedied the error by settling the charge and the Board had no reason to disbelieve her explanation, the Board's finding that she was accountable must have been pretextual.  Brown misses the mark.  It is uncontested that she failed to prevent the misuse of her card in this instance.  Whether the card was used by mistake or not is

irrelevant to that finding.  That the Board did not accept
Brown's payment of the charge as sufficient mitigation does not
impugn the Board's motives in recommending Brown's termination
based in part on this violation.  Importantly, the unauthorized
purchase was not an isolated violation but came within days of
another unauthorized use of Brown's government credit card (the
cash withdrawal).

To the extent Brown argues that similarly situated
employees were treated differently for similar rule violations,
she has not presented competent evidence to support her claim.
Brown's only evidence of comparators is her own deposition
testimony that several unidentified VA employees told her that
they had made mistaken personal purchases on their government
credit cards and that they were allowed to pay the charges
without further consequences.  This evidence is deficient for
two reasons.  First, Brown's discussion of her coworker's out-
of-court statements constitutes inadmissible hearsay.  See
Dávila v. Corporación de P.R. para la Difusión Pública, 498 F.3d
9, 17 (1st Cir. 2007).  Brown has not identified an exception to
the hearsay rule that might apply to those statements.  "'It is
black-letter law that hearsay evidence cannot be considered on
summary judgment' for the truth of the matter asserted."  Hannon
v. Beard, 645 F.3d 45, 49 (1st Cir. 2011) (quoting Dávila, 498
F.3d at 17).  Second, without information about the unnamed

coworkers' employment status (probationary or not probationary) and the circumstances of their violations (whether theirs were isolated occurrences or involved a similar constellation of incidents), a factfinder could not conclude that they were similarly situated such that Brown's disparate treatment is indicative of pretext.

### 4. Lack of disclosure in compensatory travel time request

The Board sustained the charge that Brown had violated the VA's policies when she failed to inform fiscal staff that she had traveled home by car instead of flying in connection with her request for compensatory travel time credit. Brown does not dispute that the VA's policies required disclosure in these circumstances. Instead, she argues that she made a sufficient disclosure, pointing to evidence that in an earlier communication concerning her hotel receipt she had informed a travel clerk that she had "found [her] own transportation back." Doc. No. 66-22. Since that same clerk later submitted the request for compensatory time on Brown's behalf, Brown contends that the onus was on that clerk to make further inquiries about Brown's mode of transportation and that Brown was not accountable for the error.

Brown's evidence does not lend itself to a plausible inference that the Board's finding that she had failed to make the required disclosure rested on such weak grounds as to be

"unworthy of credence." See Reeves, 530 U.S. at 143; Billings, 515 F.3d at 55-56. On the contrary, all she points to is a vague and incomplete disclosure about her transportation, made in a different context than her request for compensatory travel time. Brown's attempt to use that statement to deflect blame from herself is likely one of the reasons the Board castigated her for failing to take responsibility for her conduct. In these circumstances, it cannot be inferred that the Board's decision not to accept Brown's explanation demonstrates pretext.

     5.   <u>Refusal to accept training materials</u>

Another undisputed charge the Board sustained was that Brown had refused to accept training materials on workplace civility from Primera in October 2014, as part of her discipline for the June incident with Bowley. Brown appears to argue that she should not have been required to review the training materials because she was faultless in her exchange in Bowley. As discussed above, however, the Board was not required to accept that narrative.

To the extent Brown claims that she had properly conditioned her acceptance of those materials on recording the meeting, which Primera refused, her claim is meritless. As a general matter, an employee does not have a right to record a meeting without the employer's consent. See, e.g., Perkovich v. Roadway Exp. Inc., 106 F.3d 401 (6th Cir. 1997) (table) (holding

that employer had legitimate reason to terminate employee "for attempting to tape-record her performance review after having been requested not to bring the recorder to her review"). Accordingly, Brown has presented no evidence that the Board's finding of insubordination in this instance was pretextual.

### 6. Refusal to accept interim proficiency report

Brown has likewise failed to call into question the Board's finding that she had refused to meet with Primera to receive her interim proficiency report. Although Brown argues that this interaction did not occur, she has not pointed to any evidence to that effect. She merely cites her own deposition testimony that she did not receive her interim proficiency report from Primera. See Doc. No. 66-14 at 79. Those statements, however, are not inconsistent with the Board's finding that the reason Brown did not receive the proficiency report was her refusal to meet with Primera when Primera sought to give it to her.

But even if Brown had supported her denial with competent evidence, that alone would not enable a factfinder to conclude that the stated reason was a pretext for discrimination. Brown cannot just "impugn the veracity" of the Board's finding but must point to "specific facts" from which a factfinder could infer that the Board's finding was "intended to cover up the employer's real and unlawful motive of discrimination."

Theidon, 948 F.3d at 497 (quoting Vélez, 585 F.3d at 452).
Brown has not made that showing here.

      7.   <u>Difficulty in interpersonal relationships</u>

     Lastly, the Board found that Brown had difficulty in her
interpersonal relationships at work.  The evidence in support of
that finding included statements from several coworkers and a
supervisor concerning Brown's unprofessionalism, inappropriate
communications, or strained relations with others.  For example,
one provider refused to work with Brown because she did not
"work collaboratively" or "take responsibility for patients."
Doc. No. 110-4 at 254.  But the evidence was not one-sided.
Brown supplied the Board with multiple letters of support from
colleagues that praised her professional demeanor, skills, and
teamwork.  She argues that the Board unfairly disregarded those
letters in favor of evidence from coworkers with whom she hardly
ever worked or who had other reasons to speak ill of her.

     The evidence favoring Brown on this issue does not render
the Board's finding "unworthy of credence" or otherwise allow an
inference that the finding was pretextual.  See Reeves, 530 U.S.
at 143; Billings, 515 F.3d at 55-56.  At most, a factfinder
could conclude that the Board wrongly found that Brown had
difficulty in interpersonal relationships in the workplace.  But
"evidence contesting the factual underpinnings of the reasons
for the [employment decision] proffered by the employer is

insufficient, without more, to present a jury question." Morgan
v. Mass. Gen. Hosp., 901 F.2d 186, 191 (1st Cir. 1990)
(alteration in original) (quoting Dea v. Look, 810 F.2d 12, 15
(1st Cir. 1987)); see Theriault, 890 F.3d at 353. Even if Brown
were able to demonstrate that the Board was mistaken in its
finding, that alone would not tend to show that the finding was
pretextual and that race was a motivating factor in her
discharge. See Morgan, 901 F.2d at 191; see also Dávila, 498
F.3d at 17 (explaining that "proof of a mistaken judgment" as to
the reason for discharge does not give rise to an inference of
discriminatory discharge); Hawkins v. Mary Hitchcock Mem'l
Hosp., 22 F. App'x 21, 23 (1st Cir. 2001) (similar). There is
simply nothing in the record that would allow a factfinder to
infer that the Board's finding was a "sham intended to cover up"
discriminatory animus. Theidon, 948 F.3d at 497 (quoting Vélez,
585 F.3d at 452).

                              ***

    Brown's alternative attempts to establish pretext fare no
better. First, Brown offers her subjective belief that both
Primera and the members of the Board had a discriminatory
motive. "Proof of more than [a plaintiff's] subjective belief
that [she] was the target of discrimination, however, is
required" to survive summary judgment. Mariani-Colon, 511 F.3d
at 222. Equally unpersuasive is Brown's argument that the Board

                              27

was racist because its members were all white women.  See [Henderson v. Mass. Bay Transp. Auth.](), 977 F.3d 20, 35 & n.19 (1st Cir. 2020) (all white composition of a hiring committee does not create an inference of racial discrimination).  Lastly, Brown's deposition testimony that Primera once described another minority nurse as "not a good nurse," "[not] professional," and "always whiny," see Doc. No. 100-6 at 39, does not support Brown's claim that Primera bore discriminatory animus towards minorities.  Nothing in this ambiguous statement supports an inference that Primera's disapproval was based on that nurse's race.  See [Lehman v. Prudential Ins. Co. of Am.](), 74 F.3d 323, 329 (1st Cir. 1996) ("Isolated, ambiguous remarks are insufficient, by themselves, to prove discriminatory intent.").

In sum, Brown has failed to raise a triable issue of material fact as to whether the reasons given for her termination were pretextual.  She has presented no evidence that the incidents upon which the Board recommended her termination occurred in a manner substantially different than as the Board described them.  Nor has she offered any evidence that other employees who were similarly situated to herself engaged in similar conduct and were treated more favorably.  In short, the undisputed evidence shows that Brown engaged in unprofessional conduct and violated multiple policies during her probationary period and was therefore terminated.  There is no evidence from

which a reasonable factfinder could conclude that the stated

reasons for her termination were a mere pretext for

discrimination.  Accordingly, I grant the defendant's motion for

summary judgment on the discriminatory termination claim.

B.    <u>**Retaliatory Termination Claim**</u>

Brown's next claim is that she was terminated in

retaliation for her complaints about harassment.[3]  Title VII

retaliation claims also proceed under the <u>McDonnell Douglas</u>

burden-shifting framework outlined above.  To establish a prima

facie case of retaliation, a plaintiff must show that (1) she

engaged in protected conduct; (2) she experienced an adverse

employment action; and (3) there was a causal connection between

the protected conduct and the adverse employment action.

<u>Hernandez v. Wilkinson</u>, 986 F.3d 98, 103 (1st Cir. 2021).  "A

report of conduct that allegedly violates Title VII is protected

if the employee who reported the conduct had a 'good faith,

reasonable belief that the underlying challenged actions of the

---

[3] Brown contends that her termination was also in retaliation for
her complaint of discrimination at another VA facility four
earlier.  Brown has not pointed to any evidence that the
decision-makers at the Manchester VA knew about that earlier
complaint, which precludes a finding that they were motivated to
retaliate as a result of it.  See <u>Medina-Rivera v. MVM, Inc.</u>,
713 F.3d 132, 139 (1st Cir. 2013).  In any event, because I
assume that Brown engaged in protected conduct by complaining
about harassment at the Manchester VA, her prior protected
activity is neither relevant to my analysis nor does it
otherwise bolster her claim.

employer violated [Title VII].'" Id. (quoting Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009)). With respect to causation, the plaintiff must show that her employer's "desire to retaliate was the but-for cause of the challenged employment action." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013).

Assuming Brown has met her prima facie burden, she has not produced evidence from which a factfinder could conclude that the legitimate, non-retaliatory reasons offered for her termination – the Board's findings of misconduct – were a pretext for retaliation. Brown principally relies on the same evidence and arguments she advanced in her discrimination claim to show pretext. Those arguments fail for the same reasons I discussed above.

All that is left is the temporal proximity between Brown's protected conduct and her termination. Specifically, Primera requested the summary review of Brown's employment less than two months after Brown complained that she was being subjected to a hostile work environment and that Primera had failed to provide her with safe working conditions. "Although such close temporal proximity 'may suffice for a prima facie case of retaliation,' it 'does not, standing alone, satisfy [the plaintiff's] ultimate burden to establish that the true explanation for her firing was retaliation for engaging in protected conduct rather than' the

reasons articulated by [the employer]." Echevarría v.
AstraZeneca Pharm. LP, 856 F.3d 119, 138 (1st Cir. 2017)
(alterations omitted) (quoting Carreras v. Sajo, Garcia &
Partners, 596 F.3d 25, 38 (1st Cir. 2010)); see Sanchez-
Rodriguez v. AT & T Mobility P.R., Inc., 673 F.3d 1, 15 (1st
Cir. 2012) (affirming grant of summary judgment on retaliation
claim where plaintiff's only evidence of pretext was temporal
proximity between protected conduct and adverse employment
action); Mariani-Colon, 511 F.3d at 224 (same); Calero-Cerezo v.
U.S. Dep't of Just., 355 F.3d 6, 25-26 (1st Cir. 2004) (same);
Hodgens, 144 F.3d at 170-71 (same); see also Holloway v.
Thompson Island Outward Bound Educ. Ctr., Inc., 275 F. App'x 25,
26-27 (1st Cir. 2008) ("suspicions" raised by temporal proximity
"can be authoritatively dispelled . . . by an employer's
convincing account of the legitimate reasons for the firing").

The Board's largely uncontested findings that Brown engaged
in a repeated pattern of improper conduct during her relatively
short employment constitute legitimate reasons for her firing.
Brown has not overcome this barrier by presenting evidence from
which a factfinder could reasonably infer that the reasons given
for her discharge were pretextual and that she would not have
been terminated but for her protected conduct.  Therefore, the
defendant is entitled to summary judgment on the retaliatory
discharge claim.

C.    **Failure to Hire Claims**

Brown alleges that the VA failed to hire her for three other positions due to racial discrimination and retaliation. These claims are likewise not triable.

The stated reason why Brown failed to secure the two additional positions at the Manchester VA was because she was discharged from her then-current position at the same facility. There is no evidence that this legitimate reason was pretextual or that the hiring officials for the new positions were motivated by either Brown's race or retaliatory animus.  Thus, her claims with respect to those two positions must fail.

With respect to the Massachusetts VA position, the given reason for not hiring Brown was that she received the lowest interview score of the six candidates interviewed by telephone. There is no evidence that the interviewing committee knew about Brown's race or her prior protected activities.[4]  As a result, she has failed to make out a prima facie case that she was denied that position because of racial discrimination or retaliation.  See Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139

---

[4] Brown speculates that one of the interviewers, Dr. McCarthy, knew about her administrative complaint against the Manchester VA because, after Brown's departure, he had investigated allegations of bullying made against Primera.  Improbable inferences and rank speculation, however, cannot preclude summary judgment.  Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 855-56 (1st Cir. 2008).

(1st Cir. 2013) ("[T]he employee must show that the retaliator knew about her protected activity – after all, one cannot have been motivated to retaliate by something he was unaware of."); O'Connor v. Northshore Int'l Ins. Servs., 61 F. App'x 722, 724 (1st Cir. 2003) (affirming the dismissal of a discrimination claim where the plaintiff admitted the decision-makers were not aware of her protected status). But even if Brown had met her prima facie burden, there is no evidence from which a factfinder could infer that the legitimate reason for her non-selection was pretextual. Accordingly, these claims as deficient as well.

## IV.  CONCLUSION

Brown has failed to come forward with evidence from which a reasonable factfinder could conclude that her termination was a pretext for discrimination or retaliation. Her failure to hire claims falter for the same reason. Accordingly, I grant the defendant's motion for summary judgment (Doc. No. 83) on all claims. The clerk of court is directed to enter judgment and close the case.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

July 14, 2021

cc:  Deana Brown, pro se
     Terry Ollila, Esq.